Matthew K. Bishop, *applicant for pro hac vice*
Montana Bar No. 9968
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Tel: 406-324-8011
bishop@westernlaw.org

Kelly E. Nokes, *applicant for pro hac vice*
Montana Bar No. 39465862
Western Environmental Law Center
208 Paseo del Pueblo Sur, No. 602
Taos, New Mexico 87571
Tel: 575-613-8051
nokes@westernlaw.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The National Trust for Historic Preservation, a non-profit organization; The Wilderness Society, a non-profit organization; and the Sierra Club, a non-profit organization, <br><br> Plaintiffs, <br><br> vs. <br><br> David Bernhardt, as Secretary of the Department of the Interior; the United States Department of the Interior, a federal department; Raymond Suazo, Arizona State Director of the Bureau of Land Management; and the Bureau of Land Management, a federal agency, <br><br> Federal Defendants. | No. <br><br> **COMPLAINT** |

**INTRODUCTION**

1. The National Trust for Historic Preservation, The Wilderness Society, and the Sierra Club (collectively "Plaintiffs"), bring this civil action for declaratory and injunctive relief against the above-named Federal Defendants (the "Bureau of Land Management" or "BLM") under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, for violations of Presidential Proclamation 7397, 66 Fed. Reg. 7354 (Jan. 22, 2001), the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 306102, 306108; 36 C.F.R. Part 800, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

2. This case challenges BLM's March, 2018 decision to allow widespread recreational target shooting throughout the Sonoran Desert National Monument ("Monument"). The Monument was set aside and protected in 2001 as a "magnificent example of untrammeled Sonoran desert landscape" home to an "extraordinary array of biological, scientific, and historic resources." 66 Fed. Reg. 7354.

3. This Court previously found BLM's decision to allow target shooting in 100 percent of the Monument to be arbitrary, capricious, and not in accordance with law. *See National Trust for Historic Preservation ("National*

2

*Trust I") v. Suazo*, 2015 WL 1432632 (D. Ariz. March 27, 2015). This Court remanded the matter back to BLM to re-evaluate its decision and engage in a new analysis "in light of the shortcomings" identified by the Court. *Id.* at *14.

4. On remand, BLM completed a new "re-evaluation" but neglected to prepare a new analysis, collect new data, or conduct new surveys. Nor did BLM attempt to supplement, update, or revise its previous target shooting analysis. BLM's new target shooting decision on remand thus suffers from many of the same deficiencies identified by this Court in *National Trust I*. BLM's authorizes target shooting in roughly 90 percent of the Monument, including within the area's iconic saguaro cactus forests, occupied wildlife habitat, and areas known to contain high densities of cultural and historic sites. These are areas that BLM's own staff deemed unsuitable for target shooting. Damage to the Monument's objects from target shooting is well documented and continues to this day. BLM's decision also allows target shooting in areas without proper backstops. These areas were deemed unsafe for target shooting.

5. Plaintiffs – three organizations dedicated to protecting, preserving, and restoring the Monument's resources – are thus compelled (once again) to bring this civil action for declaratory and injunctive relief. BLM's target shooting decision was made in contravention of BLM's duty under the

Proclamation and FLPMA to manage the Monument for the "paramount purpose" of protecting its objects and in contravention of the NHPA and NEPA.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action under 28 U.S.C. § 1331, and 5 U.S.C. § 704.

7. This Court has the authority to review BLM's action(s) complained of herein and grant the relief requested, under the APA, 5 U.S.C. § 706.

8. All requirements for judicial review required by the APA are satisfied. Plaintiffs exhausted any and all administrative remedies provided by BLM.

9. The relief sought is authorized by 28 U.S.C. §§ 2201-2202, and 5 U.S.C. § 706.

10. Venue is proper in this Court under 28 U.S.C. § 1391(e).

11. Plaintiffs satisfy the minimum requirements for Article III standing to pursue this civil action. Plaintiffs – including their members, supporters, and staff – have suffered and continue to suffer injuries to their interests in using the Monument and protecting and preserving the Monument's objects. These injures are caused, in part, by BLM's target shooting decision. A favorable ruling from this Court will redress Plaintiffs' injuries. There is a present and actual controversy between the Parties.

# PARTIES

12. Plaintiff, THE NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES ("National Trust"), is a non-profit organization chartered by Congress in 1949 for the purpose of furthering the historic preservation policy of the United States and facilitating public participation in the preservation of our nation's heritage. 54 U.S.C. § 312102.  By statute, the Chairman of the National Trust is a member of the Advisory Council on Historic Preservation, an independent federal agency whose duties include implementation and enforcement of Section 106 of the National Historic Preservation Act. *Id.* § 304101(a)(8). The National Trust has long advocated for the preservation of historic and cultural resources on federal public lands, including National Monuments. The National Trust is headquartered in Washington, D.C., and has field offices located throughout the country. The National Trust has more than a million members and supporters.

13. Plaintiff, THE WILDERNESS SOCIETY, is a national non-profit organization that works to deliver to future generations an unspoiled legacy of wild places, with all the precious values they hold: biological diversity; clean air and water; towering forests, rushing rivers, and sage-sweet, silent deserts. The Wilderness Society's mission is to protect wilderness and wilderness quality lands, National Monuments and other public lands included in the National Landscape Conservation System, and inspire Americans to care for our wild and natural places. The Wilderness Society

represents more than one half million members and supporters nationwide, including almost 12,000 members in Arizona.

14. Plaintiff, the SIERRA CLUB, is a national nonprofit organization with 67 chapters and about 780,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Grand Canyon Chapter of the Sierra Club in Arizona has nearly 16,000 members. Among the Sierra Club's highest priorities is protecting and preserving national monuments, including the Sonoran Desert National Monument at issue here. The Sierra Club's concerns encompass all aspects of the Sonoran Desert National Monument, including the protection of wildlands, wildlife habitat, water resources, air, archaeological sites, public health, and the health of its members, all of which stand to be affected by BLM's actions as set forth herein.

15. The National Trust's, The Wilderness Society's, and the Sierra Club's ("the Plaintiffs") staff, members, and supporters have a strong interest in protecting, preserving, and restoring the natural, biological and cultural/historical integrity of the Sonoran Desert National Monument. Protecting the resources of the Monument and other public lands included in the National Landscape Conservation System is a major program effort for Plaintiffs. Plaintiffs report to their members, the public at large, and the press on the status of, and threats to the Monument. Plaintiffs prepared and

submitted comment letters and protests on various BLM projects, activities, and/or plans that may adversely impact the Monument's resources. Plaintiffs submitted comments during the NEPA process for the proposed target shooting decision and filed a formal protest of BLM's target shooting decision for the Monument.

16. Plaintiffs and their members frequently communicate with various BLM officials, including biologists and other staff members, about public lands management issues within and/or affecting the Monument. Plaintiffs and their members frequently raise concerns about the direct, indirect, and cumulative impacts of various land management actions on the Monument's resources, including target shooting.

17. Plaintiffs and their members have used and will continue to regularly and repeatedly use the Monument. Plaintiffs and their members use the Monument for wildlife observation, research, aesthetic enjoyment, hiking, bird watching, historic and cultural exploration, and other recreational, scientific, and educational activities.  Plaintiffs and their members derive scientific, recreational, conservation, and aesthetic benefits from using the Monument. Plaintiffs and their members enjoy viewing (and being aware of) wildlife in the area and experiencing the Monument's cultural and historic significance, designated wilderness, lands with wilderness characteristics, and diverse plant communities. For Plaintiffs and their members, using the Monument in conjunction with working to protect, preserve, and restore the Monument's resources is a key component of their enjoyment of their visits to the area.  Plaintiffs and their members will

continue working for the protection and restoration of the Monument's resources. Filing this civil action to ensure compliance with federal law is part of this effort.

18. BLM's target shooting decision has harmed and continues to harm the interests of Plaintiffs and their members. BLM's target shooting decision authorizes widespread target shooting in approximately 90 percent of the Monument. This decision has harmed and continues to harm the ability of Plaintiffs and their members to use and enjoy the Monument for scientific, recreational, conservation, cultural, historic, and aesthetic purposes, and Plaintiffs' efforts to protect, preserve, and restore the Monument's natural resources. In May, 2019, Plaintiffs and other members of the public toured portions of the Monument. Plaintiffs observed impacts to the Monument's saguaro cactus, plant communities, and cultural and historic properties from target shooting. Plaintiffs observed boulders and rocks – some of which had petroglyphs on them – shot up with bullet holes from target shooting. Plaintiffs observed areas denuded with vegetation and littered with electronic equipment, broken glass and bottles, clay pigeons, and spent rifle and shotgun shells (from recent shooting activity) throughout the Monument and in places popular for shooting.

19. BLM's preparation of an environmental impact statement ("EIS"), issuance of a Record of Decision, and adoption of a new resource management plan amendment for target shooting in the Monument, without first complying with the law as outlined in this complaint, also results in uninformed decisions and creates an increased risk of actual, threatened, and

imminent harm to the interests of Plaintiffs and their members in experiencing, protecting, and restoring the resources of the Monument. BLM's failure to comply with the law also significantly increases the risk of unnecessary and avoidable harm to the Monument's natural, biological, and historic resources and Plaintiffs' interests in protecting, preserving, and using those resources.

20. BLM's failure to comply with the law, as outlined in this complaint, has harmed and continues to harm the interests of Plaintiffs and their members.  Plaintiffs bring this action on behalf of themselves and their adversely affected members and supporters. If this Court issues the relief requested, the harm to Plaintiffs' interests will be alleviated and/or lessened.

21. Defendant DAVID BERNHARDT is sued in his official capacity as Secretary of the United States Department of the Interior. As Secretary, Mr. Bernhardt is the federal official with responsibility for all BLM officials' inactions and/or actions, including those challenged in this complaint.

22. Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is the federal agency responsible for applying and implementing the federal laws and regulations challenged in this complaint.

23. Defendant RAYMOND SUAZO is sued in his official capacity as BLM's Arizona State Director. As Arizona State Director, Mr. Suazo is the federal official with responsibility for all BLM officials' inactions and/or actions challenged in this complaint.

24. Defendant, the BUREAU OF LAND MANAGEMENT is an agency within the United States Department of the Interior that is responsible for

applying and implementing the federal laws and regulations challenged in this complaint.

**BACKGROUND**

***The Sonoran Desert National Monument***

25. On January 17, 2001 President Clinton signed Presidential Proclamation No. 7397 establishing the Sonoran Desert National Monument ("Monument") under the authority of the Antiquities Act of 1906, 54 U.S.C. § 320301 (formerly codified at 16 U.S.C. § 431). The Monument was protected by Proclamation because it is considered a "magnificent example of untrammeled Sonoran desert landscape."



26. The Monument includes a fully functioning desert ecosystem with an extraordinary array of biological, scientific, cultural and historic

resources. The Monument is considered the most biologically diverse of the North American deserts.

27. The Monument is located in Maricopa and Pinal Counties, Arizona, approximately 50 miles southwest of Phoenix. The Monument contains 486,400 acres of BLM-administered lands.

28. The Monument includes three designated wilderness areas: North Maricopa Mountains, South Maricopa Mountains, and Table Top. The Monument includes approximately 107,000 additional acres of lands with wilderness characteristics.

29. The Monument includes distinct mountain ranges separated by wide valleys and large saguaro cactus forest communities, which provide excellent habitat for a wide range of wildlife species.

30. The Monument's biological resources include a spectacular diversity of plant and animal species. The higher peaks include unique woodland assemblages. The lower elevation lands in the Monument offer one of the most structurally complex examples of palo verde-mixed cacti association in the Sonoran Desert. The dense stands of leguminous trees and cacti are dominated by saguaros, palo-verde trees, ironwood, prickly pear, and cholla. Important natural water holes, known as tinajas, exist throughout the Monument. The endangered acuna pineapple cactus and critical habitat for the acuna pineapple cactus is found in the Monument.

31. The most striking aspect of the plant community within the Monument are the abundant saguaro cactus forests.  The saguaro cactus

forests within the Monument are considered a national treasure, rivaling those within the Saguaro National Park.

32. The lower elevations and flatter areas of the Monument contain the creosote-bursage plant community. This plant community thrives in the open expanses between the mountain ranges and connects the other plant communities together. Rare patches of desert grassland can be found throughout the Monument. The washes in the area support a much denser vegetation community than the surrounding desert, including mesquite, ironwood, palo-verde, desert honeysuckle, chuperosa, desert willow, and a variety of herbaceous plants. This vegetation offers the dense cover bird species need for successful nesting, foraging and escape.

33. The Monument is home to a wide variety of wildlife species, including the endangered Sonoran pronghorn, a robust population of desert bighorn sheep, and other mammalian species such as mule deer, mountain lion, javelina, gray fox, and bobcat.

34. Over 200 species of birds are found in the Monument, including 59 species known to nest in the Vekol Valley area. Numerous species of raptors and owls also inhabit the Monument, including the elf owl and the western screech owl. Bat species within the Monument include the endangered lesser long-nosed bat, the California leaf-nosed bat, and the cave myotis.

35. The Monument supports a diverse array of reptiles and amphibians, including the Sonoran desert tortoise and the red-backed whiptail. During summer rainfall events, thousands of Sonoran green toads in the Vekol Valley can be heard moving around and calling out.

12

36. The Monument contains many archeological and historic sites, including rock art sites, lithic quarries, and scattered artifacts. The Vekol Wash is believed to have been an important prehistoric travel and trade corridor between the Hohokam and tribes located in what is now Mexico. Signs of large villages and permanent habitat sites occur throughout the area.

***BLM's management plan for the Monument***

37. Presidential Proclamation 7397 directed BLM to "prepare a management plan that addresses the actions, including road closures and travel restrictions, necessary to protect the objects" of the Monument.

38. Presidential Proclamation 7397 directed BLM to manage the Monument for the "paramount purpose" of protecting its objects. The "objects" of the Monument include the various resources identified and discussed in the Proclamation. This includes, but is not limited to, the abundant saguaro cactus forests; a rich diversity, density and distribution of plant species; rare patches of desert grasslands; a wide variety of desert wildlife, such as Sonoran pronghorn, big horn sheep and the Sonoran desert tortoise; and significant archeological resources, such as large village sites, travel corridors, rock art sites, and lithic quarries.

39. BLM started work on a proposed management plan for the Monument in 2002. As part of that process, BLM solicited scoping comments to identify "key issues" that should be addressed in planning.

40. The purpose of BLM's management plan is to provide guidance for managing the Monument and to provide a framework for future land

13

management actions within the Monument. The management plan adopted in 2012 consolidated and replaced all previous management guidance and plans for the area inside the Monument. The management plan supersedes all previous management plans adopted by BLM and interim management direction that guided management of lands within the boundaries of the Monument.

41. BLM's management plan for the Monument includes both plan level decisions (e.g., land use allocations, special designations, desired future conditions) and site-specific implementation decisions.

42. One of the key issues that emerged from BLM's scoping process was concern about how recreational target shooting should be managed inside the Monument.

43. Target shooting is defined by BLM as the "discharge of any firearm for any lawful, recreational purpose other than the lawful taking of a game animal." The activity typically involves driving to a shooting site, setting up targets, and discharging a firearm. Target shooting often causes damage to vegetation, such as the saguaro cactus, and to prehistoric rock art sites. Target shooting can cause damage to wildlife and wildlife habitat. Target shooting causes noise impacts. Target shooting displaces other recreational uses in the area. Target shooting can result in lead contamination. Lead contamination of soils from spent bullets and shells (as well as from electronics used as targets) at target shooting sites is well documented. Target shooting creates public safety concerns.

14

44. During scoping on the management plan for the Monument, some people indicated they enjoyed target shooting, while others expressed their opposition due to resource impacts, noise, and public safety concerns. BLM's early findings also revealed "public safety implications of recreational target shooting and the damage it may cause to resources," particularly "to the Monument's objects."

45. In June, 2003, an inventory of 410 popular recreation sites inside the Monument was conducted by Northern Arizona University. The results of this survey were published in Foti and Chambers (2005). The survey gave each site surveyed a rating that ranged from "not impacted" to "extreme" or most impacted. A majority of the sites (73.9 percent) received a "moderate" to "not impacted" rating but over a quarter of the sites (26.1 percent) received a rating of either "extreme" or "heavily impacted." The uses that contributed to the impacts included camping, All-Terrain Vehicle (ATV) use, and target shooting. Sixty-nine sites within the Monument were used for target shooting, and over 40 percent of those sites "had damage to saguaros." Shooting saguaros was considered a "significant resource impact" caused by target shooting. Shooting impacts were present on 50 percent of all extremely and heavily impacted recreational sites.

46. BLM's early review and analysis during the scoping process, which included Foti and Chambers (2005)'s findings, revealed that target shooting was an activity for which "demand has increased dramatically" in recent years, and an activity that was harming the Monument's objects. BLM concluded that impacts from target shooting in the Monument have become a

"management concern." BLM said impacts from target shooting in the Monument included damage to protected plants, particularly saguaro; areas denuded of vegetation, both at sites from which shooting occurs and at target areas; accumulation of debris used as targets, such as discarded appliances, propane bottles, glassware, furniture, automobile tires, plywood, sheet metal, and numerous other types of trash; and safety of visitors, particularly with regard to inadequate backstops.

47. During October to November, 2008, BLM removed six tons of debris from three recreational target shooting sites in the Monument.

48. During the scoping process, BLM flagged target shooting as an issue to carefully study and address when preparing a management plan for the Monument.

***BLM's target shooting analysis for the Monument***

49. BLM undertook a detailed analysis to ascertain the suitability of recreational target shooting inside the Monument when preparing its management plan for the Monument.

50. BLM's target shooting analysis was conducted in two phases. First, a geographic information system ("GIS") analysis was conducted to find areas with a significant presence of Monument objects and high natural or cultural resource sensitivity, and to locate areas where there is no suitable terrain for target shooting (i.e., areas where the natural slope of the terrain may not be conducive to safe target shooting). Second, field visits to all areas that were not excluded from target shooting by the GIS analysis (the first phase) were surveyed to assess on-the-ground conditions.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

51. BLM's target shooting analysis revealed very few locations that would qualify as appropriate places for target shooting in the Monument.

52. The first phase of BLM's target shooting analysis – the GIS analysis – revealed that approximately 389,989 acres, or 80 percent, of the Monument could be adversely impacted by target shooting and was unsuitable for such activity.

53.  BLM's target shooting analysis revealed the Monument's palo-verde-mixed cacti vegetation community, which provides the most iconic images of the Monument, is especially threatened by target shooting. BLM said these dominant cactus and tree species provide forage, nesting, and cover habitat for numerous wildlife species and are vulnerable to damage from shooting. BLM documented many examples of intentional and/or incidental destruction of saguaros and trees at target shooting sites in its analysis:



17

54. BLM's target shooting analysis also revealed that the Monument's high-quality desert tortoise habitat was unsuitable for target shooting. BLM's analysis said the desert tortoise excavates and inhabits burrows in rocky hillsides against which target shooters often place targets. BLM said sustained target shooting may cause direct mortality to desert tortoise, and indirect impacts to tortoise habitat through loss of forage and cover due to damage or loss of vegetation, increased vulnerability to predation as predators are attracted to areas of trash and garbage, and ingestion of plastic and other trash.

55. BLM's target shooting analysis also deemed the Juan Bautista de Anza National Historic Trail corridor ("Anza Trail") to be unsuitable for recreational target shooting.  The Anza Trail is considered the "premier historic cultural site" of the Monument and is managed in a corridor approximately one-mile wide across the Monument. The general landscape view within and from the Anza Trail corridor has remained largely unchanged since 1776, when the Anza Expedition occurred.  The Anza Trail is frequently used by visitors to the Monument for sightseeing, camping, and youth group educational events.  Recreational target shooting in this area poses safety concerns where the Trail passes through the North Maricopa Mountains.  In this area, user groups are brought into close proximity with existing and potential shooting sites by the mountainous terrain and the level terrain to the east and west of the mountains, which does not provide suitable backstops to the corridor.

18

56. In addition to areas deemed unsuitable due to concerns for Monument objects, BLM's GIS analysis also deemed areas without a sufficient backstop (i.e., areas without slopes greater than 15 degrees) to be unsuitable for shooting due to concerns over public safety. BLM determined that the "vast, flat areas" in the Monument are not suitable for target shooting given the absence of natural backstops and obvious public safety concerns.

57. BLM's first phase GIS analysis revealed that approximately 389,989 acres, or 80 percent, of the Monument is unsuitable for recreational target shooting due to: (a) significant concerns over impacts to the Monument's objects; and/or (b) concerns for public safety.

58. BLM's GIS analysis revealed that approximately 96,411 acres or 20 percent of the Monument may be suitable for target shooting due to the lack of significant Monument objects and presence of sufficient slope for safe shooting. BLM conducted field visits to these areas to ground-truth the results of the GIS analysis and determine whether such areas remain potentially suitable for target shooting.

59. BLM's field visits evaluated the remaining areas (eight specific locations) using the following four criteria: (1) presence of significant Monument objects or high natural and cultural resource sensitivity (not captured in the phase one GIS analysis); (2) visitor safety and experience; (3) accessibility by motor vehicles; and (4) the physical suitability of the terrain for shooting activities.

60. BLM's field visits indicated that six of the eight areas were unsuitable for target shooting due to concerns for visitor safety, potential impacts to Monument objects, or inaccessibility by motor vehicles. This included: Gap Tank (A), Gap Tank (C), Gap Well (A), Hidden Valley (A), Hidden Valley (B), and Pipeline I (A). BLM's field visits indicated that two areas were potentially suitable for target shooting. These two areas included an 84-acre area known as "Hidden Valley (C)" and a 682-acre area known as "Gap Tank (B)" as depicted on BLM's map:



20

61. Gap Tank (B) is not accessible by motor vehicles, and is thus less likely to be utilized by the public. BLM found that target shooting in the Monument is "almost exclusively" associated with sites that are readily accessible by motorized vehicles, with shooting activity occurring very near the vehicles.

62. BLM determined that Hidden Valley (C) is the area best suited for target shooting in the Monument, but that allowing target shooting at Hidden Valley (C) would require some improvements to protect visitor safety. BLM said it "does not compromise on the safety of its visitors." BLM concluded that, while Hidden Valley (C) is the best place in the Monument to allow target shooting, the area is still only "moderately safe as a shooting site."

63. BLM said its current policy and guidance provides two methods for allocating public lands for target shooting: (1) direct sale under section 203 of FLPMA; or (2) through patents issued under the Recreation and Public Purposes Act of 1926. However, BLM found that "neither of these methods" would be compliant with the Proclamation establishing the Monument. BLM therefore concluded that allocating Hidden Valley (C) for target shooting was incompatible with agency policy and incompatible with the Monument.

64. BLM's target shooting analysis recommended that 100 percent of the Monument be "unavailable for recreational target shooting." BLM came to the same conclusion for the neighboring Ironwood Forest National Monument (which remains closed to recreational target shooting). BLM-

administered lands outside the Monuments have remained open to target shooting.

65. BLM's target shooting analysis was based on the best available science, including GIS analysis and field surveys. BLM's target shooting analysis referenced and incorporated the Foti and Chambers (2005) survey results.

***BLM's 2012 decision to allow target shooting in 100 percent of the Monument***

66. On August 25, 2011, BLM released a draft EIS and draft management plan for the Monument for public review and comment. Appendix G in the draft EIS included BLM's target shooting analysis, which concluded that target shooting was not suitable inside the Monument due to damage to the Monument's objects and concern over public safety.

67. In the draft EIS, BLM identified Alternative E as the "preferred alternative" because it balanced human uses with the "paramount purpose" of protecting the Monument's objects, as required by the Proclamation. BLM explained that, in accordance with its target shooting analysis, target shooting was not appropriate in the Monument. BLM's rationale was presented to various stakeholders, including shooting organizations, discussed in the draft EIS, and reviewed by the BLM's Arizona State Director, the Director of the BLM, and BLM's Washington Office.

68. In September, 2011, BLM explained to the Arizona State Director that it "determined that [target] shooting should not be allowed to continue . . . In the case of recreational target shooting we determined, based on BLM

22

staff assessment and independent university research, that recreational target shooting was causing substantial damage to monument resources, particularly to vegetation and rocky areas, and in some cases to rock art. We further determined that this damage was long-term, like in the 100 year or greater range due to the preponderance of damage to long-lived and slow growing species such as saguaro." BLM noted that, although the Monument would be closed to target shooting, the entire surrounding Lower Sonoran planning area (approximately 930,200 acres of BLM land) "would remain open to recreational target shooting."

69. Following the public review and comment period on the draft EIS, BLM reaffirmed its decision to prohibit target shooting in the Monument. BLM concluded that "no comments received pertaining to target shooting caused us to reconsider the alternatives or the decision in the proposed alternative. No new compelling information was provided." BLM found no reason to change its preferred alternative or re-consider the methods or findings of its target shooting analysis. Some opposition from shooting groups was received, but BLM stood by its "sound analysis" and obligation to comply with the Proclamation's mandate to protect the Monument's objects.

70. In 2012, BLM began preparation of the final EIS and proposed plan to prohibit target shooting in the Monument. BLM explained that target shooting was analyzed in depth and that the preferred alternative in the final EIS and proposed management plan would close the Monument to shooting in order to protect the Monument's objects. BLM committed itself to a May 4,

2012, date for publishing a Notice of Availability of the final EIS and proposed management plan in the Federal Register.

71. On March 12, 2012, BLM sent a copy of the Notice of Availability for the final EIS and management plan for the Monument to the Washington Office for approval.

72. On April 4, 2012, and having received permission from the Director, BLM sent a copy of the final EIS and management plan for the Monument to the printers.

73. During the month of April, 2012, the Notice of Availability package for the final EIS and Monument management plan wound its way through the Washington Office with no problems and reports were that "all was OK." During this time, BLM received all paper copies of the final EIS and Monument management plan back from the printer (approximately $45,000 worth), submitted the Notice of Availability for publication in the Federal Register, and was "anxiously anticipating release of the EIS."

74. On April 27, 2012, BLM officials in Arizona received word that the Secretary of the Interior's office refused approval of the already printed final EIS and Monument management plan, and was directing BLM to reverse its decision on target shooting inside the Monument.  No explanation was provided.

75. The Secretary of the Interior's office rejected BLM's request to wait to make the change until after protests are filed on the final EIS and resolved by BLM. The Secretary directed that the reversal of the target shooting decision occur immediately and without delay.

76. The Secretary of the Interior's office directed BLM to destroy the $45,000 worth of printed copies of the final EIS and Monument management plan.

77. The Secretary of the Interior's office directed BLM to go to EPA and "pull" the copy of the Notice of Availability and produce a new version of the final EIS and Monument management plan that allowed target shooting inside the Monument.

78. At the Secretary of the Interior's direction, BLM went back over the final EIS and Monument management plan to change and add new language to reflect the Secretary's directive. BLM deleted its earlier statements in the final EIS that target shooting harms the Monument's objects in violation of the Proclamation. However, BLM did not (and could not) change its target shooting analysis, Appendix G in the final EIS.

79. BLM struggled with how to make the new target shooting decision required by the Secretary of the Interior comport with its earlier analysis and findings. BLM first suggested "expunging the whole issue of recreational target shooting" from the final EIS and management plan because there were simply "[t]oo many rewrites to other sections if they don't."

80. BLM produced an "options" paper to evaluate its options. Options explored included: (a) adopting the No Action Alternative (which would allow target shooting in 100 percent of the Monument); (b) choosing Alternative B (which would allow target shooting in 20 percent of the Monument); or (c) taking the time to further consult with stakeholders and push the decision date back to November 16, 2012.

81. The Secretary of the Interior's office directed BLM to go with option (a) and adopt the No Action Alternative. BLM explained that this would not work: "the problem with doing Alt A [the No Action Alternative], is that it is inconsistent with the [target shooting] analysis in Appendix G and the finding that target shooting is incompatible with the Proclamation."

82. BLM was unsure how to handle the situation and found itself in a "catch-22." BLM was unable to release the document in time for public review and protest and unable to "choose an option, [the No Action Alternative] that would violate the Proclamation." BLM said the biggest "con" with the Secretary's directive to adopt the No Action Alternative was its incompatibility with the Proclamation and BLM's target shooting analysis. BLM said "[i]t will be a challenge to develop a rationale in the [final] EIS for selecting the No Action alternative for target shooting. Building the bridge between the existing analysis and the proposed alternative will take careful consideration." BLM said that continuing the current situation and allowing target shooting throughout the Monument – as proposed by the Secretary's office – "perpetuates a situation [that] we have shown through analysis . . . does not protect the objects of the monument."

83. On May 3, 2012, BLM met with the Washington Office and was given explicit instructions to make the change and adopt the No Action Alternative, which would allow target shooting in 100 percent of the Monument.

84. BLM was instructed to add a discussion about possible mitigation measures, which it did: "The proposed action would maintain the monument

26

open to recreational target shooting subject to mitigations designed to protect monument objects." The word "mitigation" was later removed from the final EIS by BLM in recognition that harm from target shooting in the Monument cannot really be mitigated. BLM said "[e]ither you have a use that is compatible with the object, or you have a use that is not compatible with protection." BLM said it "cannot protect objects from the impact of either an appropriate or inappropriate shooter's bullet." BLM replaced the phrase "subject to mitigation" with the phrase "subject to Management and Administrative Actions" designed to protect the Monument objects.

85. In May, 2012, BLM drafted policies to be included in the final decision and management plan for the Monument. BLM said all shooting would be "subject to" such policies and effective restrictions would be "in place" once the decision was signed.

86. On June 15, 2012, BLM released a final EIS and Monument management plan for the Monument.

87. On September 14, 2012, BLM signed a final Record of Decision adopting a final management plan for the Monument.

88. BLM's final decision authorized recreational target shooting in 100 percent of Monument. BLM elected not to make target shooting "subject to" any policies, restrictions, or mitigation measures as stated in May, 2012. BLM elected instead to: (1) "encourage" shooters to read and follow voluntary best management practices; (2) continue to monitor and patrol popular shooting sites (as it always has); and (3) develop – at some future, unspecified date – supplemental rules to manage shooting in the Monument.

27

***National Trust for Historic Preservation v. Suazo***

89. In September, 2013, Plaintiffs challenged BLM's 2012 decision to allow target shooting in 100 percent of the Monument. *See National Trust I*, 2015 WL 1432632 (D. Ariz. 2015).

90. On March 27, 2015, this Court issued a memorandum opinion and order in *National Trust I*. This Court agreed with Plaintiffs that BLM's decision violates FLPMA and the Proclamation "because the decision fails to protect the objects of the Monument" from target shooting. *Id*. at *5.  In *National Trust I*, this Court said it "could not conclude that BLM acted reasonably in opening the Monument to shooting. There is simply too great an incongruity between the information contained in the Final EIS and the decision to allow shooting throughout the Monument." *Id*. at *7.

91. In *National Trust I*, this Court vacated portions of the BLM's management plan, record of decision, and final EIS permitting recreational target shooting throughout the Monument. *Id*. at *14.

92. In *National Trust I*, this Court remanded the matter back to BLM "for reconsideration" of its target shooting decision in light of the Court's order.

***BLM's new 2018 decision to allow target shooting in 90 percent of the Monument***

93. On January 21, 2016, BLM published a notice of intent in the Federal Register of its plans to prepare a new EIS and amended Monument management plan for target shooting in accordance with this Court's order in *National Trust I*.

28

94. In December, 2016, a draft EIS and draft amended management plan for target shooting was submitted for public review and comment.

95. The draft EIS included five target shooting alternatives. Alternative A is the no action alternative, which would allow target shooting on approximately 486,400 acres (100 percent of the Monument). Alternative B allows target shooting on approximately 476,300 acres (98 percent of the Monument). Under Alternative B, target shooting would be allowed in the entire Monument except the small area closed by the Court's narrow injunction in *National Trust I*. Alternative C allows target shooting on approximately 433,100 acres (89 percent of the Monument). Alternative D allows target shooting on approximately 166,500 acres (34 percent of the Monument). Alternative E prohibits target shooting in 100 percent of the Monument as recommended by BLM's previous target shooting analysis.

96. In October, 2017, BLM issued its final EIS and proposed amended management plan for target shooting.

97. In the final EIS and proposed management plan, BLM said the recreational target shooting is dispersed throughout the Monument. BLM said target shooting is concentrated at locations next to motorized vehicle routes.

98. In the final EIS and proposed management plan, BLM said it "does not have data illustrating demand placed on the [Monument] for recreational target shooting," but BLM concluded that "commonly observed evidence of recreational target shooting-related litter implies recreational target shooting has increased during the past 5 years."

99. In the final EIS and proposed management plan, BLM said target shooting sites in the Monument "commonly exhibit recreational target shooting damage to dominant vegetation, such as saguaro cacti or trees, rock outcrops, and regulatory and informational signs."

100. In the final EIS and proposed management plan, BLM said in areas used for target shooting, "there are often large quantities of litter, including spent shells and target debris, broken bottles, cans, wooden pallets, appliances, computers, television sets, cardboard boxes, propane bottles, and abandoned vehicles."

101. In the final EIS and proposed management plan, BLM said increased urbanization near the Monument has created challenges for managing target shooting. BLM said "[c]ommonly, other recreation visitors are displaced when target shooters occupy an area." BLM said this displacement "is the result of the sights and sounds of recreational target shooting; over time the lands commonly become too littered and denuded to attract visitors seek a recreation experience that does not involve recreational target shooting."

102. In the final EIS and proposed management plan, BLM said Arizona's strong public demand for target shooting is increasingly being shifted to BLM-administered lands.

103. In the final EIS and proposed management plan, BLM said that, since the Monument was designated in 2001, "impacts from recreational target shooting have increasingly become a management concern. Such impacts commonly include damage to protected plants, particularly saguaro

cacti; areas denuded of vegetation, both at sites from which recreational target shooting occur and at target areas; accumulation of debris used as targets . . . The safety of other visitors, particularly with regard to inadequate backstops, is a concern as well."

104. In the final EIS and proposed management plan, BLM stated that field observations by resource managers and law enforcement officers reveal target shooting "has become increasingly popular," especially near the greater Phoenix metropolitan area. BLM found that "[n]ew and more powerful firearms used by target shooters may increase the public safety risk due to the distance that bullets can travel."

105. In the final EIS and proposed management plan, BLM identified Alternative C as its "proposed alternative."

106. Under Alternative C in the final EIS, only the Juan Bautista de Anza National Historic Trail and trail corridor would be off limits to target shooting. The remaining 433,100 acres (89 percent of the Monument) would be available for target shooting.

107. In October, 2017, a lobbyist with the National Rifle Association ("NRA") corresponded with an official in the Secretary of the Interior's office and with an attorney in the Interior Solicitor's office about the final EIS and proposed management plan for the Monument.

108. The NRA's lobbyist provided copies of the NRA's comments on the draft EIS and draft management plan for the Monument to the federal officials. The NRA's comments said it supported Alternative C but "strongly" recommended that it be modified to allow target shooting in an additional

area – a "finger of land" on the northern boundary of the Monument, near Road #8002G.

109. On August 31, 2018, the NRA published a post on its website entitled "NRA Helps to Stop BLM From Closing Monument to Target Shooting." The NRA took credit for expanding recreational targeting shooting inside the Monument. The NRA said that as a result of its work, BLM "backed down" from its proposed alternative.

110. On March 5, 2018, BLM signed its final Record of Decision for target shooting decision inside the Monument.

111. BLM's decision is a "modified" version of Alternative C from the final EIS. BLM decided to modify Alternative C to allow target shooting in a "finger of land" on the northern boundary of the Monument, near Road #8002G. This is the precise change recommended by the NRA. This modification makes an additional 600 acres available for target shooting inside the Monument.

112. BLM's ultimate decision authorizes target shooting on 435,700 acres of land (approximately 90 percent) of the Monument:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



26      113. BLM's decision includes a "monitoring and mitigation protocol," in

27  order to "assess and respond to impacts" on the Monument's objects from

28

33

target shooting. BLM said its "monitoring and mitigation protocol" is "not a complete plan" and is presented only as "an initial framework."

114. BLM's "monitoring and mitigation protocol" is premised on a Limits of Acceptable Change process, which includes defining "baseline standards" and developing "management objectives." Under this process, impacts, damage, and changes are allowed to the baseline conditions so long as BLM's "management objectives" are met. This is considered an "acceptable change." BLM used the Foti and Chambers (2005) study to define its baseline standard. BLM developed two "recreation management zones" for its recreation management objectives.

115. BLM's "monitoring and mitigation protocol" is designed to respond to impacts to the Monument's objects after they are detected. BLM's "monitoring and mitigation protocol" includes a plan to monitor impacts from target shooting at specific sites. Not all sites or areas open to target shooting will be monitored. BLM's "monitoring and mitigation protocol" includes mitigation responses designed to repair damage to the Monument's objects, even though some impacts to Monument objects are considered "non-remediable." BLM said some impacts to Monument objects can be remedied through revegetation, cleanup efforts, and other methods.

116. BLM's "monitoring and mitigation protocol" includes no requirements to prevent or avoid damage to the Monument's objects before they occur. Instead, BLM will only use public education and outreach efforts. Public education and outreach efforts have failed to protect the Monument's objects since the area was designated and protected in 2001.

34

117. BLM said its decision to allow target shooting in approximately 90 percent of the Monument was chosen because it provides the "best balance" between resource protection and human use of the Monument.

118. BLM's decision allows target shooting in the Monument's palo verde-mixed cacti vegetation community, as well as the Monument's saguaro forests and other cacti communities. BLM's decision allows target shooting in the Monument's thick woodlands of palo verde, mesquite, and ironwood trees that cover the slopes and outwash plains. The Monuments' cactus and tree communities provide forage, nesting, and cover habitat for numerous species.

119. BLM's decision allows target shooting in occupied Sonoran desert tortoise habitat, as well as areas inhabited by Sonoran pronghorn, desert big horn sheep, and other mammalian species such as mule deer, javelina, mountain lion, gray fox, and bobcat.

120. BLM's decision allows target shooting in areas with cultural and historic properties including areas known for their rock art sites, lithic quarries, and archeological artifacts. BLM's decision allows target shooting in the Vekol Wash, an area believed to have been an important prehistoric travel and trade corridor between the Hohokam and tribes located in what is now Mexico. BLM's decision also allows target shooting in areas where there are signs of prehistoric villages and dwellings in the Monument.

121. BLM's decision allows target shooting inside the Monument's three designated wilderness areas, as well as additional lands with wilderness qualities. BLM's decision allows target shooting inside designated critical habitat for the endangered acuna cactus.

35

122. BLM's decision does not rely on the results of the Agency's previous target shooting analysis, including BLM's GIS analysis and BLM's field surveys on target shooting in the Monument. BLM said this Court in *National Trust I* "vacated" the target shooting analysis.

123. BLM said its previous target shooting analysis was merely an "attempt" to "forecast the suitability of recreational target shooting" in the Monument. BLM said its previous target shooting analysis included "inherent assumptions" that disregarded site-specific level impacts. BLM did not say what those "assumptions" were or why they were inaccurate, and did not say what "site-specific level" impacts where disregarded. BLM did not analyze any "site-specific level" impacts.

124. BLM said its previous target shooting analysis was incomplete and did not consider impacts to all Monument objects. However, BLM did not explain why or how it was incomplete. BLM did not "complete," amend, or supplement the target shooting analysis. BLM did not say which other Monument objects were supposedly excluded from the target shooting analysis, nor did BLM provide any additional information about those other Monument objects.

125. BLM said the previous target shooting analysis did not include spatial data at the proper scale. However, BLM did not obtain and analyze new spatial data at a scale it now considers "proper."

126. BLM's decision was made in the absence of a new target shooting analysis. Instead, BLM's decision relies on Foti and Chambers (2005) for its analysis of target shooting impacts. BLM did not collect and evaluate new

spatial data for a target shooting analysis. BLM did not conduct a new GIS analysis to analyze the presence of Monument objects and safety concerns. BLM did not conduct new field surveys to analyze the impacts of target shooting on the Monument's objects. BLM's decision failed to comply with this Court's remand order in *National Trust I*.

**FIRST CAUSE OF ACTION**
**(Violation of FLPMA and the Proclamation)**

127. Plaintiffs incorporate all preceding paragraphs.

128. Pursuant to FLPMA, BLM is to manage areas for multiple use except "where a tract of such public land has been dedicated to specific uses according to any other provisions of law." 43 U.S.C. § 1732(a).

129. Proclamation 7397 establishing the Sonoran Desert National Monument under the authority of the Antiquities Act of 1906, 54 U.S.C. § 320301 (formerly codified at 16 U.S.C. § 431), directs BLM to protect the objects of the Monument. 66 Fed. Reg. 7354. Proclamation 7397 dedicated the area in the Monument for the specific use and purpose of protecting its objects for future generations.

130. BLM's target shooting decision threatens and harms the objects of the Monument. BLM's target shooting decision harms the public's ability to use and enjoy the Monument. BLM's target shooting decision fails to protect the objects of the Monument. BLM's target shooting decision fails to take the actions necessary to ensure that the objects of the Monument are protected. BLM's "monitoring and mitigation protocol" does not protect the Monument's objects.

131. BLM's decision and/or failure to protect the Monument's objects as required by Proclamation 7397 and FLPMA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A), 706(1).

## SECOND CAUSE OF ACTION
### (Violation of the NHPA – failure to identify and evaluate effects)

132. Plaintiffs incorporate all preceding paragraphs.

133. Pursuant to Section 110(a) of the NHPA, BLM must identify, evaluate, and protect historic and cultural sites within the Monument. 54 U.S.C. § 306102.

134. Pursuant to Section 106 of the NHPA, BLM must take into account the effect of any "undertaking" on historic and cultural sites in the Monument. *Id.* § 306108. BLM must make a reasonable, good-faith effort to identify cultural and historic properties, determine whether identified properties are eligible for listing on the National Register (based on various criteria), assess the effects of any undertaking on eligible historic properties and determine whether the effects will be adverse, and if so, avoid, minimize, or mitigate any adverse effects. 36 C.F.R. § 800.4.

135. BLM's target shooting decision is an "undertaking" under the NHPA.

136. When authorizing target shooting in approximately 90 percent of the Monument, BLM failed to make a reasonable and good faith effort to identify historic and cultural properties.

38

137. The Monument was set aside and protected, in part, because it is home to "many significant archaeological and historic sites, including rock art sites, lithic quarries, and scattered artifacts." 66 Fed. Reg. at 7355. To date, BLM has only surveyed and inventoried "approximately 6 percent" of the Monument and only has records for 250 sites. BLM admits this is "a small sample compared with the overall size of [the Monument]." BLM says in areas where it has surveyed, site densities in the Monument are high, ranging from 5 to 15 archaeological sites per square mile. BLM estimates that if the Monument was "completely inventoried" it would likely contain "more than 5,000 sites."

138. When authorizing target shooting in approximately 90 percent of the Monument (435,700 acres, including the vast majority of motorized routes where shooting is "most likely" to occur), BLM only surveyed nine small sites where target shooting was deemed "popular." BLM did not survey all sites and areas open to target shooting inside the Monument. BLM did not survey all sites and areas along and/or adjacent to motorized routes where BLM concedes target shooting is "most likely" to occur and most often occurs. BLM did not survey all areas used for target shooting in Foti and Chambers (2005) or in the BLM's previous target shooting analysis. BLM did not survey areas of the Monument open to target shooting where BLM knows a high density of cultural and historic properties may exist. BLM did not properly define the "area of potential effects." 36 C.F.R. § 800.16(d).

139. BLM's decision and/or failure to survey for, identify, and evaluate impacts to cultural and historic properties as required by the NHPA is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A), 706(1).

### THIRD CAUSE OF ACTION
### (Violation of the NHPA – arbitrary "no adverse effect" finding)

140. Plaintiffs incorporate all preceding paragraphs.

141. Pursuant to Section 106 of the NHPA, BLM is required to make an "adverse effect" or "no adverse effect" finding for all undertakings and apply the NHPA's criteria for making such determinations. 36 C.F.R. § 800.5. An "adverse effect" is found when an undertaking "may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* § 800.5(a)(1). "Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." *Id.*

142. Based on "all known previous" cultural and historic resource inventories done in the Monument, 249 sites have been identified and include "some level of documentation." BLM's considers and treats all 249 cultural sites in the Monument as "eligible" for inclusion in the National Register.

143. BLM determined that its target shooting decision would have "no adverse effect" on these 249 sites.

144. BLM made this "no adverse effect" determination even though it concedes that "further analysis" on the sites and their sensitivity and

vulnerability to target shooting is required. BLM recognized that at least 20 sites are deemed "vulnerable" to target shooting and nine of these vulnerable sites are not located in roadless or wilderness areas and, as such, are more accessible to target shooters. BLM does not explain why or how these and other sites will not be impacted by target shooting. BLM failed to consider all actions associated with target shooting when making its "no adverse effect" determination. BLM failed to consider indirect and cumulative effects from target shooting when making its "no adverse effect" determination.

145. BLM made its "no adverse effect" determination prior to completing consultation with the State Historic Preservation Officer (SHPO) or other consulting parties. BLM failed to provide all relevant and necessary information to the SHPO to justify and support its "no adverse effect" determination. The Section 106 regulations require BLM to invite comments from the SHPO, Tribes, and consulting parties in response to its "no adverse effect" determination, and in the event of a disagreement with that determination, to refer the disagreement to the Advisory Council on Historic Preservation. 36 C.F.R. § 800.5(c)(2). BLM failed to comply with this requirement, despite disagreement by the consulting parties with BLM's determination. This process must be completed "prior to" making its decision, 54 U.S.C. § 306108, which BLM failed to do.

146. BLM's determination that its target shooting decision will have "no adverse effect" on cultural and historic properties in the Monument is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance

41

with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A), 706(1).

## FOURTH CAUSE OF ACTION
### (Violation of NEPA – failure to analyze direct, indirect, and cumulative effects to the Monument's objects)

147. Plaintiffs incorporate all preceding paragraphs.

148.  NEPA requires BLM to adequately consider and analyze the direct, indirect, and cumulative impacts of its target shooting on the Monument's objects. "Direct effects" are caused by the action and occur at the same time and place. "Indirect effects" are caused by the action but occur later in time or are farther removed in distance but are still reasonably foreseeable. "Cumulative effects" are the impact "on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.

149.  In preparing an EIS for its target shooting decision, BLM failed to take a hard look at how target shooting may directly, indirectly, and cumulatively impact the Monument's objects. BLM did not properly define the "baseline" conditions. BLM did not analyze the direct, indirect, and/or cumulative effects to the Monument's saguaros, saguaro forests, or other vegetation communities. BLM did not analyze the direct, indirect, and/or cumulative effects to the Monument's wildlife species, including the Sonoran

desert tortoise. BLM did not analyze the direct, indirect, and/or cumulative effects to the Monument's cultural and historic properties.

150. BLM's failure to analyze the direct, indirect, and cumulative impacts to the Monument's objects is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A), 706(1).

## FIFTH CAUSE OF ACTION
### (Violation of NEPA – failure to analyze the effectiveness of mitigation measures)

151. Plaintiffs incorporate all preceding paragraphs.

152. Pursuant to NEPA, an EIS must discuss appropriate and possible mitigation measures and include an assessment of whether such measures will be effective. Agencies must take a hard look at possible mitigation measures and carefully evaluate and discuss their effectiveness.

153. BLM's decision includes a "monitoring and mitigation protocol" to assess and respond to impacts to the Monument's objects from target shooting. BLM failed to analyze the effectiveness of its "monitoring and mitigation protocol" in the draft EIS and final EIS.

154. BLM's failure to analyze the effectiveness of its monitoring and mitigation protocol as required by NEPA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A), 706(1).

# REQUEST FOR RELIEF

Plaintiffs request that this Court:

A. Declare BLM has violated and continues to violate the law as alleged above;

B. Set aside and vacate BLM's target shooting decision, resource management plan amendment, and related final environmental impact statement;

C. Enjoin target shooting in the Monument and/or portions of the Monument pending compliance with the law and direct BLM to take affirmative and reasonable steps to repair damage to the Monument's objects from target shooting;

D. Remand this matter back to BLM with instructions to comply with the law;

E. Issue other relief Plaintiffs may subsequently request;

F. Issue other relief this Court deems necessary, just, or proper;

G. Award Plaintiffs their reasonable attorneys' fees, costs and expenses of litigation;

Respectfully submitted this 22nd day of August, 2019.

/s/ Matthew K. Bishop
Matthew K. Bishop
*applicant for pro hac vice*

*Counsel for Plaintiffs*